**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SHAUN KAREEM BURNEY,

*Petitioner-Appellant*,

v.

RONALD BROOMFIELD, Warden,

*Respondent-Appellee*.

No.22-99002

D.C. No.
2:10-cv-00546-
FLA

OPINION

Appeal from the United States District Court
for the Central District of California
Fernando L. Aenlle-Rocha, District Judge, Presiding

Argued and Submitted January 13, 2026
Pasadena, California

Filed May 7, 2026

Before: Mark J. Bennett, Lawrence VanDyke, and Holly A.
Thomas, Circuit Judges.

Opinion

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Shaun Burney's 28 U.S.C. § 2254 petition for a writ of habeas corpus challenging his California conviction for murder.

In a certified issue, Burney claimed that the trial judge was biased and engaged in judicial misconduct. The State responded that because the California Supreme Court denied the claim both on the merits and on procedural grounds, the deferential standard of review prescribed by the Antiterrorism and Effective Death Penalty Act (AEDPA) applies, and the claim is procedurally defaulted. Because deciding whether Burney procedurally defaulted his judicial bias and misconduct claims would require the resolution of several complex preliminary questions, the panel exercised its discretion to proceed directly to the merits, which it reviewed de novo.

Burney argued that the trial judge demonstrated bias against Burney and in favor of the death penalty. The panel held that Burney's judicial bias claim fails on the merits. The trial judge's comments do not demonstrate that the judge had either a personal interest or direct involvement in the proceedings. The judge neither relied upon knowledge acquired outside proceedings nor displayed deep-seated and unequivocal antagonism that would render fair judgment impossible. In context, the challenged comments also do not show an intolerable risk of bias nor

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

create an appearance of impropriety, as the judge emphasized that the jurors had to be convinced beyond a reasonable doubt to find the defendant guilty and stressed the importance of serving as a jury member.

In his judicial misconduct claim, Burney alleged that the trial judge's behavior during voir dire and trial resulted in proceedings being conducted without dignity and respect. Burney cited various examples of what he described as racist comments, inappropriate jokes and banter, jokes about assaulting jurors, and sexist comments, rendering the proceedings fundamentally unfair in violation of the Due Process Clause of the Constitution. The panel held that Burney did not demonstrate that the challenged comments rendered his trial so fundamentally unfair as to transgress constitutional limits. The comments do not appear to be adverse to Burney to a substantial degree and were not of sufficient gravity to warrant the conclusion that fundamental fairness was denied.

Burney requested that the panel expand the certificate of appealability (COA) to include (1) his claims that his confession to the detectives should have been excluded at trial because it was involuntary and he did not validly waive his *Miranda* rights; and (2) his claim that the trial court's admission of his codefendants' allegedly "inadequately-redacted and self-serving statements" violated *Bruton v. United States*, 391 U.S. 123 (1968). The panel declined to expand the COA because the district court's denial of these claims is not debatable.

## COUNSEL

Marta VanLandingham (argued), Jennifer Molayem, and Mihal R. Ansik, Deputy Federal Public Defenders; Cuauhtemoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Vincent P. LaPietra (argued) and Meredith S. White, Deputy Attorneys General; Holly D. Wilkens, Supervising Deputy Attorney General; James W. Bilderback II, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Diego, California; for Respondent-Appellee.

## OPINION

PER CURIAM:

In 1994, Shaun Burney was jointly tried and convicted of the murder of Joseph Kondrath. Burney and his codefendants, Allen Burnett and Scott Rembert, had approached Kondrath, forced him out of his car at gunpoint, and ordered him into the trunk. The defendants drove Kondrath's car to various places and discussed needing to kill him because he had seen their faces. Ultimately, Burney opened the trunk and fired a single shot into it. That shot killed Kondrath.

Burney now appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. In his appeal, he raises one certified issue: whether the trial judge was biased and engaged in judicial misconduct. In his brief to our court, Burney also raises two uncertified claims.

First, he argues that his confession was involuntary and that his *Miranda v. Arizona*, 384 U.S. 436 (1966), waiver was invalid. Second, he argues that the introduction of his codefendants' redacted statements resulted in a *Bruton v. United States*, 391 U.S. 123 (1968), error that was not harmless.

We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. We affirm the district court's denial of Burney's habeas petition and deny Burney's request to expand the certificate of appealability ("COA").

## I.

On June 10, 1992, sometime after 8:00 p.m., a civilian traffic enforcer noticed an illegally parked car. As he walked around the car, the traffic enforcer saw "a dark puddle near the right rear tire" and something "dripping from the trunk area." Law enforcement arrived to assist in the inspection of the car and found Kondrath's body in the trunk. Kondrath's autopsy revealed a gunshot wound on the back of his right hand and through the left side of the back of his head.

Police investigation led to the arrests of 18-year-old Burney, 20-year-old Rembert, and 18-year-old Burnett.

## A.

## 1.

Investigators interviewed each defendant separately. Transcripts of the defendants' redacted statements were later admitted at trial.

### a. Burney's Interview

At the outset of Burney's interview, Detective Georgia Erickson told Burney that they were investigating a

homicide and said to him, "I'm required by law to read you your Miranda warnings." Detective Erickson then advised Burney of his *Miranda* rights. After reading each right to Burney, Detective Erickson asked if he understood, and Burney responded "[y]es" each time. Burney was offered something to drink and a blanket before questioning began.

Upon questioning, Burney explained that before sunrise on June 10, 1992, the defendants intended to steal Ron Hussar's car stereo. After they failed to locate Hussar's car, they saw Kondrath getting into a car. One of the defendants was drunk and wanted Burney to steal the car, but Burney did not want to. Burney said that he approached the car and asked Kondrath for the time. When Kondrath cracked the window open to hear him, one defendant pointed a gun at him through the window. The defendants took Kondrath's wallet and forced him out of the car and into the trunk.

Defendants drove to several places—first to Jeffrey Howard's house and then to look for members of Watergate Crips, a rival gang. At some point, the drunk defendant insisted they kill Kondrath because he had seen their faces. Burney stated, "we're gonna kill him" after the drunk defendant said, "you gotta kill him." Burney then told the drunk defendant that he (the drunk defendant) was drunk and that they should leave. Burney admitted to the detectives that, despite not wanting to shoot Kondrath, he nevertheless did so. Burney described opening the trunk and, without looking, firing one shot toward where he had heard Kondrath's voice. When the detectives asked Burney why he did not refuse to shoot Kondrath and hand the gun back to the drunk defendant instead, Burney responded that he was afraid the drunk defendant would accidentally shoot him

(Burney).   After Burney fired the gun, he recalled handing it to someone and running away.

At times during the interview, Burney became emotional and began to cry.   He cried when he realized the detectives were in possession of the gun linked to the murder.   He cried again when asked about Kondrath's actions right before Burney shot him.   When Burney cried, the detectives offered him a tissue, gave him time to gather himself, and offered him something to drink.

After describing the events, Burney confessed that he "did everything" and that "nobody else did it."   He also stated, "I guess I'm going to the pen.   The f[***]in' pen. Damn."

### b. Rembert's First Interview

Initially, Rembert stated that he had heard about the person who "was found in the trunk of the car" from the newspaper and from his mother.   Rembert insisted that he was not involved.   Eventually, Rembert said that "one [of them] was drunk and the other one just wanted to go ahead and do it."   He stated that he did not touch anyone and told "them" not to "do it" because there was "no reason to kill [Kondrath]."   Rembert said he thought "they" were going to take someone's stereo and that "they" had not said anything about killing someone when they left the apartment.   Rembert stated that the "people that were involved . . . tricked [Kondrath], asked him what time it was, he rolled down his window, put a gun to his head, and got out and he went inside the trunk.   They put him inside the trunk."

### c. Rembert's Second Interview

The detectives told Rembert that the others had been arrested and charged with homicide. Rembert subsequently admitted being present during the shooting. He said that when they all left the apartment, Rembert had the gun in his pants pocket, and that they intended to take Hussar's stereo, but Hussar's car was not there. On their way back to the apartment, they saw Kondrath, and the others started talking about "jacking him." One of them asked for the gun that Rembert had and Rembert gave it to him. One of them asked Kondrath for the time, Kondrath rolled down his window a bit, one of them pointed the gun through the window, and Kondrath got out of the car and into the trunk. Rembert relayed that they went to Howard's house to get a shotgun, drove around, and that Rembert shot the handgun twice in the air before they returned the shotgun. Back at Howard's house, Rembert said they got more bullets for the gun and Rembert put them in the gun. Rembert recalled that, back in the car, the others were arguing about who was going to shoot Kondrath. One of them wanted to do it because "he" did not get to shoot the gun into the air.

### d. Burnett's Interview

Burnett admitted being present when Kondrath was shot but denied having shot Kondrath. Burnett recalled that the night of the shooting, he did not want to go out but "they" wanted him to go because he was drunk. When they all left the apartment, "they" wanted to take Hussar's speakers. Burnett stated that they could not find Hussar's car but that when they saw Kondrath, they decided to steal his car to "[g]o blastin' Watergate." Burnett told the investigators that he walked over and then "[o]ne of the others" asked

Kondrath the time, and when Kondrath rolled down the window, "[o]ne of the others" "put the gun in the window and told [Kondrath] to get out the car" and "threw [Kondrath] in the trunk."

Burnett said that after the defendants left Howard's house, Burnett had suggested driving Kondrath somewhere far away but instead, "he" pulled over and started wiping down the car and then shot Kondrath. Burnett said one of them was farther away from the car "ready to jump the fence already" and one of them said, "f[***] it, I'll do it." According to Burnett, "one of the others" said "don't shoot that mother f[*****]" and then he [the shooter] just shot him." The shooter "said f[***] it and [then] everybody ran." Burnett recalled that the shooter opened the trunk and fired a single shot.

## 2.

The State of California ("the State") charged the defendants with second-degree robbery, kidnapping, kidnapping for purposes of robbery, and first-degree murder. The indictment also alleged the special circumstances of murder in the commission of a robbery and murder in the commission of a kidnapping.[1] The State sought the death penalty only as to Burney.

## 3.

Judge Fitzgerald presided over the trial. During voir dire, the judge described the killing of Kondrath as a "very

---

[1] As to Burney, the indictment alleged as to all counts the personal use of a firearm. The trial court subsequently granted the prosecution's motion to dismiss the firearm-use allegations against Burney for all counts except first-degree murder. The indictment alleged that Rembert and Burnett were vicariously armed with a firearm.

horrendous crime," and as "dastardly conduct." He described the potential penalties as "a very difficult possible punishment for one defendant" and not "a walk in the park" for the other defendants, either. The trial judge instructed prospective jurors to disregard their own life experiences during the trial, and he instructed the jurors not to speculate about the prosecutor's decision to seek the death penalty for one defendant but not the others. The trial judge also remarked that everyone should believe in the death penalty.

At times during voir dire, the trial judge appeared to joke with jurors. When explaining the purpose of voir dire, he stated:

> All we're concerned with now is whether you have the ability to serve on this case if you have passed all the requirements that the attorneys may ask of you during the course of their inquiry in a thing that we call voir dire, which simply means they're going to ask you a bunch of questions to find out if you are stupid or smart. Not exactly. But something like that.

When encouraging prospective jurors to serve on the jury, the trial judge explained the case was not going to last very long relative to other cases and stated:

> [I]t's going to be a fairly enjoyable experience in my court because I'm so lazy and you won't have to put that much time in. But there are other judges around that are a little bit more brutal than I. In fact, I believe

> Judge Ogre next door is picking a very long case.

The judge also commented:

> [T]he ones that stay on this case as jurors may pick up on the fact that the court's got a really weird sense of humor.   I can't help it, it's me, that's what I am.   I apologize to you right now if I offend people.   That's going to happen.   I don't do it intentionally.   Maybe I do do it intentionally.   But in any event, I apologize to you for offending anyone that I may talk to during this process.

In response to a prospective juror stating she was an airline stewardess, the trial judge quipped, "Can I get some cheap seats?" to which the prospective juror responded, "See what I can do."   And when another prospective juror made a joke, the trial judge responded, "I'm supposed to be the funny one here."   Just before a break during voir dire, the trial judge told prospective jurors that those who were not excused for hardship had to return in the morning.   The judge joked that "[i]f the hallway is filled with people out here don't panic don't commit suicide or anything like that just go down . . . and come back after about a half hour."

Some of the comments had a racial or ethnic component. Questioning one prospective juror, Duke Nguyen, the trial judge asked if Nguyen was "foreign born" or born in the United States and whether he was "educated in the United States."   In response to the judge's follow-up questions, Nguyen responded that he was born in Vietnam, left when he was eight years old, did not learn about Vietnam's legal

system, and did not live in other countries or learn about their legal systems.

The judge also pointed out during voir dire that all three defendants were Black and that very few prospective jurors were Black.  The judge asked if anyone had any "disagreeable or difficult or violent or any kind of incident with any Black individual" or any "confrontation with any member of our Black community."  The judge then confirmed that all prospective jurors accepted the notion that the law is "color blind" and that everyone, "regardless of race, . . . is entitled to full consideration of the law."

Some other jokes had a gender component.  Burnett's counsel asked a prospective juror what his wife would say if counsel said he looked like a hard-working man.  The prospective juror responded that his wife would say that he had a "one-track mind," meaning that he was goal oriented. The trial judge interjected, "I thought it was women." After a prospective juror mentioned that she was a Christian, the trial judge asked if she could follow the laws and rules of the court and not those of her religion.  The prospective juror responded that she would and added, "I can't imagine you would do anything that I wouldn't go along with."  The judge replied, "I wish there were ladies in my past that have all thought that way."  He then stated, "That's an aside. That's that stupid sense of humor.  I apologize.  You never know what I'm going to say."

In trying to determine whether a prospective juror was up to the task, the trial judge explained that a juror's role was to administer the law and that such a role was not a light one. The trial judge asked if the prospective juror was "up to that kind of task" and explained as an example that "[e]very once in a while I tell my wife and my grown daughters that I am

the law. They have come to the point where they begin to believe that. And I say it jokingly occasionally but sometimes I'm serious." And when a prospective juror was answering the question of what his typical day looked like and stated that he made breakfast, did the food shopping, planned the meal, cooked dinner, and washed the dishes, the trial judge joked, "Does your wife get out of bed yet?"

Several other jokes were about the deliberation process or capital punishment. Explaining to the jurors that California allows capital punishment, the judge stated, "California has executed one guy so far. And even though we take forever to finalize these things and they do go on, they are to pick up their Baskin Robbins ticket to step into the gas chamber." After learning that prospective jurors were talking about the death penalty and related issues, the judge admonished prospective jurors in open court not to discuss their opinions on capital punishment or the case because it was important to get each juror's personal opinion. The judge noted that a prospective juror was overheard talking about their ideas on capital punishment and joked, "That person now has to be shot."

In another instance, the trial judge hypothesized that if, during deliberation, one juror says he wants to acquit but cannot because one or all of the defendants did not testify, "the other 11 jurors are entitled, under the law, to beat the devil out of that juror." After the prospective jurors laughed, the trial judge stated that if anything like that happened or there was any other violation of a court order during deliberations, other jurors "should simply remind that juror of the law." The trial judge also examined the impartiality of a prospective juror who stated she was uncomfortable with serving on a jury that could vote in favor of the death penalty. To assess her ability to follow the law,

the judge asked her to imagine being "hogtie[d] . . . and drag[ged] into the jury room" and to consider whether, in that situation, she could render a verdict imposing death if the law warranted it. The juror responded that she would feel obligated to do so but was unsure whether she wanted to be in that position.

After the trial began, the judge made a number of comments that were not directly pertinent to the evidence or the proceedings. Just before the prosecutor began cross-examining an investigator, the prosecutor asked whether the investigator was used to being cross-examined by the State and the investigator said he was not. The trial judge then stated, "Tear him up." During closing argument, the prosecutor referred to the medical examiner as Dr. Fukumoto instead of Dr. Katsuyama. The trial judge corrected him and said, "I know they all look alike, but you still have to get the names straight." And during deliberations, when the jury informed the court that it could not resolve two counts and two special circumstances for one defendant, the trial judge addressed the foreperson, saying, "you are still the foreperson; is that correct? In other words, they haven't lynched you or anything like that?" After counsel for Rembert objected to one of the prosecutor's questions, the trial judge said, "Touchy-feely time or what?"

Outside the presence of the jury, the trial judge read a note from a juror and joked that it addressed him as "your magnificent exalted worthiness." The trial judge at some point also commented that he had a "jacket of being oppressive to counsel on another case or two," and then asked, "is there any counsel that feels so overwhelmed by the court's ominous presence to the point that you can't do your job and represent your client adequately?" In another

instance, counsel for Burney had referred to the defendants as "three boys" in open court. The trial judge admonished him outside the presence of the jury not to refer to the defendants as boys. The judge told counsel that the defendants were "grown boys" and "that means they're men." The judge confirmed with counsel that counsel was not "trying to endear any kind of favoritism with the jury" by using the term "boys."

4.

None of the defendants testified during trial, and Burney did not present any evidence. Burney's counsel argued that he was not guilty of felony murder because the robbery and kidnapping concluded before the murder took place. Counsel also argued that Burney was only guilty of second-degree murder because the murder was not premeditated or deliberate.

The jury returned guilty verdicts as to all counts for Burney and Burnett, and to all but the murder and robbery counts (and the special circumstances) for Rembert.

B.

During the penalty phase, Burney submitted psychological evidence through the testimony of Dr. Stephen Wells, Ph.D. Dr. Wells testified that Burney was a child both in intellectual development and social maturity. Dr. Wells believed that Burney was a "follower" and did not intend to kill Kondrath. Burney admitted to Dr. Wells that at the time of the crimes, he felt stuck in a situation he did not want to be in and was afraid that if he did not kill Kondrath, Rembert and Burnett would have hurt or rejected him, leaving him nowhere to go. In Dr. Wells's opinion,

Burney "was experiencing the symptoms of a manic-depressive mental disorder at the time of the murder."

Dr. Wells also recounted a number of traumatic events that Burney had experienced. When Burney was eight years old, he and his mother returned home from a funeral to find that his father had changed the locks and was living with another woman. When he was nine years old, Burney experienced suicidal feelings. At 15 years old, Burney went to live with his father after a reconciliation, but his father soon kicked him out, renewing Burney's feelings of abandonment. When Burney was 18, shortly before the murder, Thomas, his mother's husband, began living with Burney and his mother. Thomas physically abused Burney's mother. After Burney and Thomas had an altercation, Burney could no longer live at home.

Forensic psychiatrist Dr. William Vicary, M.D., also testified. He concluded that prior to the murder, Burney was depressed and suicidal. Burney had told him that he had drunk 40 ounces of malt liquor before the murder. Dr. Vicary reported that Burney's mother physically abused him when he was a child but later became "over indulgent" and "over protective." Dr. Vicary also echoed Dr. Wells, stating that Burney experienced trauma when his father left, when his mother physically abused him, and when he was forced to leave both his parents' and friend's homes. Dr. Vicary further testified that Burney expressed remorse for the killing and opined that Burney would not constitute a danger while incarcerated.

The jury sentenced Burney to death on May 25, 1994.

C.

1.

In 2005, Burney filed his first state habeas petition in the California Supreme Court ("CSC"). In 2009, the CSC, on direct appeal, affirmed Burney's convictions and sentence. The CSC later denied his first state habeas petition on the merits and on procedural grounds. The United States Supreme Court denied a petition for certiorari.

In 2011, Burney filed a second state habeas petition in the CSC. In 2016, the CSC denied some claims on the merits, and some claims as procedurally barred.

2.

Burney filed the operative federal habeas petition on March 1, 2011. In 2020, the district court dismissed some of Burney's claims as procedurally barred and denied some claims on the merits. In 2022, the district court denied the remainder of Burney's claims and entered judgment.

II.

"We review *de novo* a district court's denial of a habeas corpus petition and review for clear error any factual findings made by the district court." *Jurado v. Davis*, 12 F.4th 1084, 1090 (9th Cir. 2021). "The decision by the district court to decline to order an evidentiary hearing is reviewed for abuse of discretion." *Roy v. Lampert*, 465 F.3d 964, 968 (9th Cir. 2006).

A.

Because the federal petition was filed after April 24, 1996, our review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004).

Under AEDPA, we may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)–(2).

We apply deferential review under AEDPA to the last reasoned state court decision.   *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018).   To satisfy § 2254(d)(1), Burney must show that "'there was no reasonable basis' for the [CSC]'s decision."   *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 98 (2011)).   Under § 2254(d)(2), "[a] state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them."   *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)); *see Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

## B.

A petitioner seeking a COA on the denial of constitutional rights "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; *or* that the questions are adequate to deserve encouragement to proceed further." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (alteration in original) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

## III.

We begin with the certified issue on appeal. Burney raises claims of judicial bias and misconduct.**[2]** He argues that jocular, racist, and sexist comments by the trial judge during voir dire and trial rendered his trial fundamentally unfair in violation of the Due Process Clause of the Constitution. He further alleges that the trial judge's behavior resulted in proceedings being conducted without dignity and respect. The State responds that because the CSC denied this claim both on the merits and on procedural grounds, AEDPA deference applies, and the claim is procedurally defaulted. Alternatively, the State asserts that under both AEDPA and de novo review, Burney's claim lacks merit. In reply, Burney alleges that the State waived the affirmative defense of procedural default by failing to raise it in district court.**[3]**

---

[2] It is not clear whether Burney intended to raise a separate judicial bias claim. We therefore address judicial bias and judicial misconduct separately.

[3] In Claim X of his initial state habeas petition, Burney alleged, among other things, that improprieties during voir dire deprived him of his constitutional rights. As relevant here, he pointed out that the trial judge improperly described the crime as "very horrendous" and stated that there was "a very difficult possible punishment for one defendant and the prospects for the other two isn't a walk in the park either." Burney alleged that the judge's statements were prejudicial and signaled a bias against him and in favor of the death penalty. In Claim XIII, Burney argued, among other things, that the trial judge's comments amounted to judicial misconduct which violated his right to due process, rendering his trial fundamentally unfair.

The CSC denied Claims X and XIII on the merits. It also denied Claim X "to the extent it alleges the trial court erred by informing the jury that the death penalty is a punishment more severe than life in prison without parole" and Claim XIII because they were not raised on

Deciding whether Burney has procedurally defaulted his judicial bias and misconduct claims would require the

---

appeal.   Additionally, the CSC barred Claim X because it could have been, but was not, raised in the trial court.

In Claim 8(C) of his second state habeas petition, Burney again challenged the propriety of the trial judge's comments during voir dire and pointed out several additional statements.   He argued that the comments demonstrated that the trial judge was biased and displayed partiality.   In Claim 9, Burney again raised a claim of judicial misconduct and bias based on the trial judge's rulings and comments made at trial and referenced comments specified in Claim 8(C).   He further argued that the trial judge's jocular and insensitive comments and attitude during trial constituted judicial misconduct because the judge failed to conduct the proceedings with dignity and respect.

The CSC denied Claims 8 and 9 because they were untimely, could and should have been raised on appeal but were not, and were raised and rejected in the initial petition.   The CSC also denied Claim 8 because it was raised and rejected on appeal and should have been raised in trial court but was not.   The CSC additionally denied Claim 9 insofar as it could and should have been raised in the initial petition but was not.

In Burney's § 2254 petition, Claims 8(C) and 9 substantially mirrored Claims 8(C) and 9 from his second state habeas petition.   The district court ordered the parties to meet and confer to determine which claims could be "resolved solely on the trial record and/or the record on appeal," and as to those record-based claims, ordered the State not to brief the question of procedural default at that time.

After the parties briefed the record-based claims, which included Claims 8 and 9, the district court applied AEDPA deference to the resolution of Claim 8(C) and concluded that the voir dire comments did not violate Burney's right to an impartial judge.   As to Claim 9, the district court recognized that the parties disagreed whether the entire claim had been adjudicated on the merits and, rather than resolve that question, decided instead to review Claim 9 de novo.   Under de novo review, the court denied Claim 9, concluding that the comments made during trial did not render the trial fundamentally unfair nor demonstrate bias.

resolution of several complex preliminary questions.    We therefore exercise our discretion to proceed directly to the merits of Burney's judicial bias and misconduct claims. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.").    We review this claim de novo.    *See Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010) (explaining that when a state court's decision is correct under de novo review it is necessarily reasonable under AEDPA's more deferential standard of review).

## A.

The Due Process Clause does not provide a uniform standard under which to analyze a judicial bias claim.    *See Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).    The Clause, however, does provide a "constitutional floor" and requires a "'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case."    *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (citation modified) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)).    To succeed on a judicial bias claim, Burney must show that the facts demonstrate "an intolerable risk of bias."    *Hurles*, 752 F.3d at 789; *see Greenway v. Schriro*, 653 F.3d 790, 806 (9th Cir. 2011) ("A showing of judicial bias requires facts sufficient to create actual impropriety or an appearance of impropriety.").    Without "evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases.'"    *Larson v. Palmateer*, 515 F.3d

1057, 1067 (9th Cir. 2008) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).  Judicial bias is a structural error that is not subject to harmless error analysis.  *See Greenway*, 653 F.3d at 805.

1.

Burney argues that the trial judge demonstrated bias against Burney and in favor of the death penalty.  He alleges that the judge predetermined his guilt by describing the crime as a "very horrendous crime" and "dastardly conduct," and by stating that the potential penalty was "a very difficult possible punishment for one defendant" and that "the prospects of the other two isn't a walk in the park either."  Burney claims that the trial judge instructed the prospective jurors to disregard their own life experiences when considering what penalty to impose.  He also objects to the judge's comments telling the jurors not to speculate about the prosecutor's decision to seek the death penalty for one defendant but not the others and remarking that "[e]verybody should believe in" the death penalty.

The Supreme Court has found judicial bias where a judge had a personal or direct interest or involvement in the proceedings.  For example, in *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971), the trial judge, who was engaged in "a running, bitter controversy" with the defendant, *id.* at 465, also ruled over proceedings to determine whether the defendant was guilty of contempt, *see id.* at 465–66.  In *In re Murchison*, 349 U.S. 133 (1955), the trial judge acted both as the trier of the defendant and the grand jury.  *See id.* at 137.  And in *Tumey v. Ohio*, 273 U.S. 510 (1927), the judge had a pecuniary interest in the cases he presided over because he stood to profit from each conviction.  *See id.* at 523.

2.

Burney's allegations do not meet the bar set by these cases. The trial judge's comments do not demonstrate that the judge had either a personal interest or direct involvement in the proceedings. The judge "neither (1) relied upon knowledge acquired outside [the] proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Liteky*, 510 U.S. at 556; *see Larson*, 515 F.3d at 1067 (relying on *Liteky* to state that without evidence of an extrajudicial source of bias, a trial judge's remarks are generally insufficient to rebut the presumption of judicial integrity).

In context, moreover, the challenged comments also do not show an intolerable risk of bias nor create an appearance of impropriety. *See Hurles*, 752 F.3d at 789; *Greenway*, 653 F.3d at 806. Indeed, the judge emphasized that the jurors had to be convinced beyond a reasonable doubt to find the defendants guilty and stressed the importance of serving as a jury member.

For example, the judge's remarks describing the crime as "very horrendous" and the potential penalty as "a very difficult possible punishment for one defendant" were made at a time when the judge was emphasizing that being a juror on this case was a serious matter and that many jurors have felt that serving on a criminal case was impactful. The judge further acknowledged that some potential jurors were probably thinking of ways to get out of service but encouraged them to remain. Thus, in context, it appears the judge made these comments to impress upon the jury the importance and seriousness of the role of jurors.

In a similar vein, the judge's description of the crime as "dastardly conduct" for which the jurors must suppress their

"revulsion," came in the context of the judge's questioning of a prospective juror to determine whether she could be an objective and fair juror. The prospective juror expressed uncertainty about her ability to remain objective, and the judge pressed her for a more definitive answer. This included telling her that it was normal for jurors to be angry if they determined that someone was guilty of the crime, but that they were required to "suppress that anger, that revulsion, that overwhelming kind of condemnation that we all must have in society of this kind of dastardly conduct." The trial judge continued, stating that jurors had to be ready to set aside their emotions, and if they determined that the defendant was guilty, to proceed to the penalty phase and evaluate the aggravating and mitigating factors dispassionately.

These comments do not intimate that the trial judge harbored a bias against Burney, nor do they display antagonism. *See Hurles*, 752 F.3d at 789; *Liteky*, 510 U.S. at 556. While the challenged comments appear off-the-cuff and informal, they are not sufficient to establish a judicial bias claim or overcome the presumption of judicial integrity. *See Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 872 (2009) ("[T]here are objective standards that require recusal when the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." (internal quotation marks and citation omitted)); *Larson*, 515 F.3d at 1067.

The three remaining comments regarding the death penalty that Burney challenges also do not demonstrate a risk of intolerable bias or create an appearance of impropriety. *See Hurles*, 752 F.3d at 789; *Greenway*, 653 F.3d at 806. When the trial judge commented that the jury should disregard their own life experiences when

determining the penalty, the trial judge was speaking to a prospective juror who had worked as a prison guard in Germany.   The prospective juror stated that after seeing the conditions of prisoners serving a sentence of life without the possibility of parole, he found it "difficult to separate life without possibility of parole from death conceptually."   In response to that statement, the trial judge informed him that he had to disregard his experience in Germany for the purpose of determining what the ultimate punishment would be in Burney's case.   In addition, the trial judge explained that he should not share his own personal life experiences with the other jurors to persuade them on any point of view, just as jurors are prohibited from bringing other outside materials into the jury room to influence other jurors.

Another comment was made during voir dire of a prospective juror who felt strongly that if a defendant was convicted of murder, they should receive the death penalty. The trial judge explained that the prosecutor had the authority to determine who to charge with a capital crime, and the jury should not speculate about the prosecutor's decision.   Outside the presence of the jury, Burney's counsel voiced his concern regarding the trial judge's admonition not to second guess the prosecutor because he intended to argue to the jury that the prosecutor in fact did make a mistake in seeking death for Burney.   The trial judge clarified that Burney's counsel would not be prohibited from making that argument and that he did not intend to suggest otherwise with his comment.

The trial judge's comment that "[e]verbody should believe in" the death penalty, also did not reflect bias when examined in context.   After the trial judge had mistakenly inferred that one prospective juror favored the death penalty, the juror clarified that she did not say she favored the death

penalty, but she did believe in it.   The trial judge responded that "[e]verybody should believe in it" and that "it's not a maybe kind of thing" because California law provided for it.

Burney does not explain how these comments, when examined in the context in which they were made, demonstrate that Judge Fitzgerald held an intolerable risk of bias against Burney and in favor of the death penalty. Indeed, considering the transcript as a whole, the trial judge accurately explained the law regarding the death penalty to the jury.   For example, the judge stressed to the jury that the defendants were innocent until proven guilty.   The judge explained that if the jury found the defendants not guilty, there would be no penalty phase.   The judge also told the jury not to "expect that there will be a second phase of the trial."   He explained that if the State failed to meet its burden, there would be no penalty phase "[b]ecause we will not commit to death people who are innocent or people who do not fully qualify having committed all the elements necessary to qualify a person for capital punishment."   The judge additionally clarified, "[Y]ou understand that the reason I'm talking to you about punishment, punishment, punishment is not because we preordained guilt in this case? In other words, it's the only way we can find out people's attitudes is to ask them?"

Burney further alleges that the trial judge's comments infringed on the jury's duty to consider the evidence and determine the appropriate penalty.   But this claim also fails. Burney relies on *Penry v. Johnson*, 532 U.S. 782 (2001), for support.   But the issue in *Penry* was whether a conflicting set of jury instructions violated the Eighth Amendment, *see id.* at 786; *Penry* did not address a claim of judicial bias.   In addition, Burney does not allege, and the record does not demonstrate, that the jury instructions were confusing or

misleading with respect to the jury's ability to consider the mitigating evidence and provide a "reasoned moral response" when determining the appropriate penalty.**4** *Id.* at 800.

## B.

The standard of review for a judicial misconduct claim is the same as that for a prosecutorial misconduct claim. *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995). That standard is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). For a general judicial misconduct claim on habeas review, "we must ask whether the state trial judge's behavior rendered the trial so

---

[4] Burney further argues that the CSC was aware of the trial judge's "propensity for judicial bias." But the cases he cites are factually distinguishable and relied only on California law, which does not control the outcome of our habeas review. *See People v. Fatone*, 211 Cal. Rptr. 288, 295 (Ct. App. 1985) (noting that Judge Fitzgerald treated defense counsel with a "demeaning, patronizing attitude"); *People v. Grist*, No. G026871, 2001 WL 1555192, at *5–10 (Cal. Ct. App. Dec. 5, 2001) (concluding that Judge Fitzgerald's behavior was similar to that condemned in *Fatone*); *Ng v. Superior Ct.*, 61 Cal. Rptr. 2d 49, 57 (Ct. App. 1997) (noting that Judge Fitzgerald had an "unusual interest in personally handling the case," made "derogatory and apparently unfounded statements concerning counsel," and refused to reinstate defense counsel despite there having been no basis to remove counsel in the first instance); *People v. Melton*, 750 P.2d 741, 764 (Cal. 1988) (disapproving of Judge Fitzgerald's remarks which could have been interpreted negatively against a party or attorney but ruling that the remarks "[fell] short of the intemperate or biased judicial conduct which warrants reversal" and noting that "[w]ell-conceived judicial humor can be a welcome relief during a long, tense trial").

fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett*, 67 F.3d at 740.

1.

Burney alleges that various comments made by the trial judge during voir dire and trial rendered the proceedings fundamentally unfair because the judge failed to maintain proper courtroom dignity and respect. Burney provides various examples of what he describes as racist comments, inappropriate jokes and banter, jokes about assaulting jurors, and sexist comments in support of his judicial misconduct claim.

For example, during voir dire, when explaining that California allows for capital punishment, the trial judge stated, "California has executed one guy so far. And even though we take forever to finalize these things and they do go on, they are to pick up their Baskin Robbins ticket to step into the gas chamber." And after a prospective juror mentioned that she was a Christian, the trial judge asked if she could follow the laws and rules of the court and not those of her religion. The prospective juror responded that she would and added, "I can't imagine you would do anything that I wouldn't go along with." The trial judge replied, "I wish there were ladies in my past that have all thought that way."

During closing argument, the prosecutor referred to the forensic pathologist as Dr. Fukumoto instead of Dr. Katsuyama. The trial judge corrected him and said, "I know they all look alike, but you still have to get the names straight." During trial, counsel for Burney referred to the defendants as "three boys." Outside the presence of the jury, the trial judge admonished him not to refer to the defendants as boys. The judge told counsel that the

defendants were "grown boys" meaning that "they're men." The judge confirmed with counsel that he was not "trying to endear any kind of favoritism with the jury" by using the term "boys." During guilt phase deliberations, the jury informed the court that it could not resolve two counts and two special circumstances. Addressing the foreperson, the trial judge asked, "[Y]ou are still the foreperson; is that correct? In other words, they haven't lynched you or anything like that?"[5]

### 2.

Out of the thousands of pages of transcripts covering Burney's voir dire and trial, the comments that Burney points to do not suffice to sustain a judicial misconduct claim. The judge's comments and behavior, although at times inappropriate, are less egregious than in other cases in which federal appellate courts have rejected judicial misconduct claims on habeas review. For example, in *Duckett*, during examination of witnesses, the trial judge asked his own questions, some of which resulted in answers helpful to the prosecution and harmful to the defendant. 67 F.3d at 740. The trial judge also took over the prosecution's questioning of one witness, criticized and expressed frustration with a defense witness when he testified, and told the prosecutor to "once in a while throw in an objection for the heck of it" during the defendant's testimony. *Id.* Though we did not condone the trial judge's behavior, we determined in *Duckett* that "when considered in the context of the trial as a whole [the

---

[5] Burney provides many more examples of comments by the trial judge in support of his judicial misconduct claim. We included more examples in the sections above and do not repeat them here. *See supra* Section I.A.3.

questioned conduct was] not 'of sufficient gravity to warrant the conclusion that fundamental fairness has been denied.'" *Id.* at 741 (quoting *Daye v. Att'y Gen. of N.Y.*, 712 F.2d 1566, 1572 (2d Cir. 1983)).

Similarly, in a case from our sister circuit, *Daye*, 712 F.2d 1566, the trial judge asked his own questions of the witnesses, repeatedly referred to the robber in the case as "the defendant[,]" and questioned the defendant in such a way as to imply that the judge disbelieved his testimony. *See id.* at 1568–70, 1572–73.   The court criticized the trial judge's behavior but concluded that the questions and comments did not render the trial unfair.   *Id.* at 1572–73.

Here, the trial judge did not take over the questioning of any witness and did not openly criticize or express frustration with Burney or his counsel.   And although some of the judge's comments—including some made to jurors— were informal, or even insensitive, Burney has not explained how they were adverse to him or rendered his trial unfair. *See id.* at 1572; *Duckett*, 67 F.3d at 741.   Indeed, the trial judge emphasized several times that his jokes and banter should not minimize the seriousness of the case or the jurors' roles.

Burney relies on *Wellons v. Hall*, 558 U.S. 220 (2010) (per curiam), to support his allegation that the trial judge was required, but failed, to conduct proceedings "with dignity and respect."   Specifically, Burney cites to the opening sentence in *Wellons*, which reads: "From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect."   *Id.* at 220.   Even if this statement were not dicta, *Wellons* is distinguishable. *Wellons* resolved a procedural issue and involved far more

egregious allegations of misconduct, including ex parte contacts between the judge, jury, and bailiff, as well as inappropriate juror gifts. *See id.* at 221–23. Nothing like that is present here. And *Wellons* did not hold that any failure by a trial judge to conduct proceedings with dignity and respect necessarily rises to the level of a Due Process violation.

Even if the judge's conduct created a "pervasive climate of partiality and unfairness" as Burney asserts, that is the standard for a federal appellate court's supervisory power over the district court on direct appeal. *Duckett*, 67 F.3d at 740 ("In reviewing cases on direct appeal, in the exercise of our supervisory powers over the district courts, . . . . there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" (quoting *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982))); *Daye*, 712 F.2d at 1571 ("[T]rial judge intervention will exceed federal standards of judicial propriety before transgressing the limits of fundamental fairness required by the Constitution . . . ."). "The only commands that federal courts can enforce in state courts are those of the Constitution." *Daye*, 712 F.2d at 1571. That power is narrower and more limited than our supervisory power over other federal courts. *See id.*

Here, Burney has not demonstrated that the challenged comments rendered his trial so fundamentally unfair as to transgress constitutional limits. *Cf. Buckelew v. United States*, 575 F.2d 515, 519 (5th Cir. 1978) ("The final nonconstitutional claim is that the trial judge interrupted the trial with jokes, stories, and personal reminiscences. Again, we do not approve of storytelling in the courtroom, but we doubt that it ever would render a trial fundamentally unfair unless it completely thwarted the introduction of

evidence, which was not the case here."). Because the challenged comments do not appear to be "adverse to the defendant to a substantial degree[,]" *Daye*, 712 F.2d at 1572, they were not "of sufficient gravity to warrant the conclusion that fundamental fairness has been denied," *Duckett*, 67 F.3d at 741 (quoting *Daye*, 712 F.2d at 1572), and thus did not "exceed[] constitutional limits," *Daye*, 712 F.2d at 1571.

3.

To be sure, our holding should not be taken as condoning or minimizing the trial judge's remarks during Burney's trial. The trial judge's comment that "they all look alike" was inexcusable and had no place in a courtroom. So, too, was the judge's quip that the foreperson had not been "lynched" by his fellow jurors. Other instances of the trial judge's commentary also contributed to a troubling lack of seriousness during a very serious case. Yet, again, "[t]he only commands that federal courts can enforce in state courts are those of the Constitution." *Id.* The question is thus not how we would rule in an exercise of supervisory power—there is no question that we "lack such authority with respect to state courts." *Id.* The question is whether the trial judge's comments, isolated within thousands of pages of transcript, were sufficiently grave, antagonistic, or adverse to Burney that they require the conclusion that Burney's trial was rendered fundamentally unfair or that they can sustain a judicial misconduct claim. When we consider the trial judge's comments in the context of the entire trial, we cannot reach that conclusion.

IV.

Burney requests that we expand the COA to include his claims that his confession to the detectives should have been excluded at trial because it was involuntary and he did not

validly waive his *Miranda* rights. We decline to expand the COA because the district court's denial of these claims is not debatable. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). In reaching that conclusion, "[w]e look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason." *Id.* As relevant here, under AEDPA's "unreasonable application" prong, 28 U.S.C. § 2254(d)(1), a "prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement,'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam) (quoting *Harrington*, 562 U.S. at 103). "[T]he state court decision [must] be more than incorrect or erroneous"; it "must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Burney also argues that he may overcome AEDPA deference because the state court's allegedly deficient fact-finding process "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

## A.

Burney presented his involuntary confession claim in his first state habeas petition, and the CSC summarily denied it on the merits and as procedurally barred. This claim is thus entitled to AEDPA deference, *see Apelt v. Ryan*, 878 F.3d 800, 825 (9th Cir. 2017), and the question before us is whether the district court's denial of this claim is debatable in light of the required AEDPA deference owed to the state court's determination. Carrying out this analysis, we conclude that a fairminded jurist could agree with the state court that Burney's confession was voluntary, and we believe that such conclusion is not debatable. Nor do we

think it debatable that a fairminded jurist could agree that it was not objectively unreasonable for the state court to decide that Burney had failed to make a prima facie showing that his confession was involuntary, and thus he was not entitled to further state court proceedings such as an evidentiary hearing.[6]

"Whether a confession is involuntary must be analyzed within the 'totality of [the] circumstances.'" *Cook v. Kernan*, 948 F.3d 952, 968 (9th Cir. 2020) (alteration in original) (quoting *Withrow v. Williams*, 507 U.S. 680, 693 (1993)). "The factors to be considered include the degree of police coercion; the length, location and continuity of the interrogation; and the defendant's maturity, education, physical condition, mental health, and age." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011) (citing *Withrow*, 507 U.S. at 693–94). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "Coercive police activity can be the result of either 'physical intimidation or psychological pressure.'" *Cook*, 948 F.3d at 968 (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)). Law enforcement's conduct may be coercive "only because, in the particular circumstances of the case, the confession is

---

[6] Because we address the merits of the involuntary confession claim, we do not consider the state court's procedural default ruling and the parties' arguments on procedural default. *See Franklin*, 290 F.3d at 1232 ("[A]ppeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar.").

unlikely to have been the product of a free and rational will." *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting *Miller v. Fenton*, 474 U.S. 104, 110 (1985)).   Thus, the key inquiry is "whether the defendant's will was overborne by the circumstances surrounding the giving of the confession."   *Id.* (alterations accepted) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)).

The totality of the circumstances show that Burney's confession was voluntary.   There was no inherently coercive police activity.   The detectives did not use threats, violence, promises, or deception to obtain Burney's confession.[7]   *See Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) ("The test [of voluntariness] is whether the confession was extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence." (quotation marks omitted) (quoting *Bram v. United States*, 168 U.S. 532, 542–43 (1897))).

Burney argues that the detectives' suggestive and persistent questioning was psychologically coercive considering his youth (18 at the time), mental deficits (including bipolar disorder, post-traumatic stress disorder, and intellectual impairments), and the length of the

---

[7] Burney alleges that, by asking him to tell his side of the story, the detectives deceived him into thinking that they wanted to help him. There was no deception because the detectives warned Burney from the start that anything he said could be used against him in court and, as discussed below, Burney understood that warning.   *See Miranda*, 384 U.S. at 469 (noting that the *Miranda* warning "serve[s] to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest").

interrogation.    But the record does not require this conclusion.   Although the interrogation transcript spans 63 pages, we found nothing in the record showing that the duration of the interrogation was lengthy.   Indeed, both below and on appeal, Burney failed to point to anything in the record demonstrating the duration of his interrogation. The length of Burney's interrogation therefore does not provide any weight to the totality of the circumstances.

Turning to the remaining factors, the record defeats Burney's claim that his youth and mental deficits rendered the detectives' questioning coercive.   Burney's full-scale IQ was 86 and his verbal IQ was 83.   This corresponds to the IQ described by Burney's expert clinical psychologist, Dr. Stephen Wells, as falling within the "dull normal range."[8]   Burney's IQ scores were at least four points above the "borderline retarded range."   While it is true that Burney's IQ scores showed that—at age 18—Burney had the mental age of a 15-year-old, the transcript of the interrogation nevertheless demonstrates that Burney's will was not overborne.

As noted above, the detectives did not use any threats, violence, deception, or promises to obtain Burney's confession.   To the contrary, the transcript suggests that the detectives acted calmly and professionally.   They also took measures to make Burney more comfortable.   At the start of the interrogation, for example, they offered Burney something to drink and a blanket.   When Burney became emotional, the detectives offered him a tissue, gave him time

---

[8] We use the terminology used by Dr. Stephen Wells, and intend no disrespect.

to gather himself, and again offered him something to drink.[9] They also took a break when Burney asked to use the restroom.   In addition, nothing Burney said suggested that he had mental deficits or difficulty understanding the detectives.   Indeed, Burney's responses were appropriate and coherent in general.[10]   In short, we see nothing in the record showing "the crucial element of police overreaching." *Connelly*, 479 U.S. at 163.

Burney's responses to the detectives' questions reinforce the conclusion that his will was not overborne. Significantly, Burney did not simply agree with the detectives' suggestions.   For example, although the detectives suggested that Burney knew that the group went to a house to pick up a gun, Burney consistently denied those

---

[9] Burney argues that police coercion is evidenced by the fact that he cried during the interview.   But viewed in context, Burney's emotional responses were not because of any coercive tactics.   Burney cried when he realized that the detectives were in possession of the gun linked to the murder and when the detectives asked about the victim's actions right before Burney shot the victim.   In context, Burney became emotional because he realized that the detectives had evidence connecting him to the crime and because he regretted his actions, not because the detectives used any coercion.

[10] The following are some examples, taken from different points during the interview, that demonstrate Burney's comprehension of the conversation: (1) Q: "How'd you get him into the trunk?"   A: "I told him to get in the trunk and he just got in the trunk.   He got in the trunk." (2) Q: "Then what happened?"   A: "I guess that's when he got the shotgun."   Q: "You guess?"   A: "Oh, that's when he got the shotgun." (3) Q: "Why'd you put the socks on your hands?"   A: "Fingerprints." (4) Q: "He look at you?"   A: "I wasn't looking at him.   I just know he didn't say nothing.   I opened the trunk.   I wasn't looking at him. And I was like, naw, man.   Can't do this.   And I was like, you gotta kill him, you gotta kill him."   Q: "So, then what happened?"   A: "I killed him."

suggestions.    He also repeatedly denied that a gun had been shot from inside the car even though the detectives disclosed that a shell casing had been found inside the car.    When the detectives suggested that the group had discussed driving the car to Pomona, Burney denied that there had been any conversations about going to Pomona.    Even when the detectives suggested that others had remembered it differently, Burney maintained that no one had talked to him about going to Pomona.    Burney also consistently denied suggestions that he had told "Jeff" about the shooting.    That Burney did not agree to the detectives' suggestions supports that his confession was deliberate and "the product of a free and rational will."    *Preston*, 751 F.3d at 1016 (quoting *Miller*, 474 U.S. at 110).

Under the totality of the circumstances, Burney's will was not overborne and thus his confession was voluntary. Because the circumstances show that the detectives did not engage in any coercive conduct—even considering Burney's age and mental deficits—the district court properly concluded that a fairminded jurist could agree with the state court that Burney's confession was voluntary.    *See Connelly*, 479 U.S. at 167.    No reasonable jurist could debate that conclusion in light of the record.

Burney also argues that, assuming the truth of his allegations, he established a prima facie case for relief and so he was entitled to further state court proceedings, including an evidentiary hearing.    *See Cullen*, 563 U.S. at 188 n.12 (explaining that when the CSC summarily denies a petition it assumes the allegations in the petition are true but does not accept conclusory allegations, and it also considers the trial record); *Montiel v. Chappell*, 43 F.4th 942, 956 (9th Cir. 2022) (describing California's habeas procedures). Because the CSC denied his claim without a hearing, Burney

argues that its decision "was based on an unreasonable determination of the facts."     28 U.S.C. § 2254(d)(2); *see also Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (noting that a petitioner may bring a challenge under § 2254(d)(2) alleging that the state court's "fact-finding process itself" was "deficient in some material way" (citing *Taylor v. Maddox*, 366 F.3d 992, 999, 1001 (9th Cir. 2004), *overruled on other grounds by Cullen*, 563 U.S. 170)).

Burney's argument is unconvincing because it rests on the faulty premise that the CSC's prima facie determination was objectively unreasonable.     *See Marks v. Davis*, 106 F.4th 941, 971 (9th Cir. 2024) (reviewing the CSC's prima facie determination for objective reasonableness under AEDPA).     Burney did not allege that the detectives improperly influenced him to confess by threats or violence, or that the detectives made any promises.[11]     He alleged that his mental impairments, along with the detectives' suggestive and persistent questioning, rendered his confession involuntary.     But as discussed above, the record shows that the detectives did not engage in any coercive conduct.     Thus, even assuming the truth of Burney's allegations, the CSC could have reasonably concluded that Burney failed to establish a prima facie case of involuntariness.     No reasonable jurist could debate that conclusion given the absence of any coercive conduct by the detectives.     Thus, we decline to issue a COA on the involuntary confession claim.

---

[11]  Burney did allege that the detectives deceived him into thinking that they wanted to help him.     But, as noted, the state court could have reasonably rejected that allegation because the detectives warned Burney that anything he said could be used against him in court.     *Supra* note 7.

B.

Burney presented his invalid *Miranda* waiver claim in his second state habeas petition. The CSC dismissed the claim as procedurally barred on multiple grounds. Rather than consider the state court's procedural rulings, however, we consider de novo the merits of the invalid *Miranda* waiver claim because the merits are straightforward.**[12]** *See Franklin*, 290 F.3d at 1232; *Berghuis*, 560 U.S. at 390 ("[A] habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review."). "[E]ven under a de novo review, 'we still defer to a state court's factual findings under [28 U.S.C.] § 2254(e).'"**[13]** *Stevens v. Davis*, 25 F.4th 1141, 1165–66 (9th Cir. 2022) (quoting *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015)). For the reasons below, the *Miranda* waiver claim fails on de novo review.

---

[12] In denying the invalid *Miranda* waiver claim on the merits, the district court applied AEDPA deference. We are, however, not limited to the district court's reasoning. *See Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003) (per curiam) ("We may affirm a district court's judgment on any ground supported by the record, whether or not the decision of the district court relied on the same grounds or reasoning we adopt.").

[13] Under § 2254(e), "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Although the State failed to argue below that § 2254(e)(1) applies, we determine that the standard applies because which standard of review to apply is a pure issue of law and the record below has been fully developed. *See Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir. 1985) (citing *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978), *overruled on other grounds by United States v. Gomez*, 165 F.4th 1199 (9th Cir. 2026) (en banc)).

Under *Miranda*, to protect a defendant's privilege against self-incrimination, law enforcement must provide warnings before performing a custodial interrogation. 384 U.S. at 478–79. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444. To demonstrate a valid waiver, the government must prove by a preponderance of the evidence two things, considering the totality of the circumstances surrounding the interrogation. *See Connelly*, 479 U.S. at 168; *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Burbine*, 475 U.S. at 421. "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Regarding the first factor of the waiver inquiry, Burney's *Miranda* waiver was voluntary even under de novo review for the reasons discussed above. *See Connelly*, 479 U.S. at 169–70 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context.").

As to the second factor, Burney argues that he did not knowingly and intelligently waive his rights because he did not understand the rights that were read to him or that he was being asked to waive them. But, as explained below, the state court found that Burney understood his rights, and Burney cannot rebut that finding by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Detective Erickson told Burney that they were investigating a homicide and then she said to him, "I'm required by law to read you your Miranda warnings." Detective Erickson then advised Burney of his *Miranda* rights.    After reading each right to Burney, Detective Erickson asked if he understood, and Burney responded, "[y]es."    At the suppression hearing during trial, Burney testified that he understood the "words of the rights" Detective Erickson spoke, but he did not believe that he could actually invoke the rights.    Burney also testified that one month before his interview with Detective Erickson, he had been arrested for attacking his stepfather and read his *Miranda* rights, although Burney claimed that he did not understand his rights then either.    The trial court found that Burney's testimony was not credible and that he understood his rights.

The trial court's findings are supported by the record. Burney acknowledged that he understood his rights during the interview, and he later admitted that he understood Detective Erickson's statements describing his rights. Burney's testimony that he did not believe the rights that were read to him was not credible in light of Detective Erickson's prefatory statement that the rights were "required by law" and because Burney had just been given *Miranda* warnings a month earlier.    In addition, Burney's appropriate and coherent responses throughout the interview suggested an overall comprehension of the conversation. *See Cook*, 948 F.3d at 967–68 (holding that the fact that defendant had been provided *Miranda* warnings before and responded coherently to investigators' questions supported that he understood his Fifth Amendment rights).    His statements also showed that he understood the consequences of abandoning his rights.    After confessing, Burney stated,

"I guess I'm going to the pen. The f[***]in' pen. Damn."
We must defer to the state court's finding that Burney
understood his rights, as it is fairly supported by the record.
*See* 28 U.S.C. § 2254(e)(1). Thus, Burney's claim that his
waiver was not knowing and intelligent because of a lack of
understanding fails. *See Berghuis*, 560 U.S. at 385
(explaining that if a defendant understands his rights, then
"it follows that he knew what he gave up when he spoke").

Burney also argues that his waiver was not valid because
he did not give an express verbal or written waiver. That
argument is meritless because an express verbal or written
waiver is not required. *See id.* at 384 ("The
prosecution . . . does not need to show that a waiver of
*Miranda* rights was express."). A suspect may waive his
rights when, as here, he "received and understood the
*Miranda* warnings," did "not invoke[] his *Miranda* rights,"
and implicitly "waive[d] the right[s] . . . by making an
uncoerced statement to the police." *Id.* at 388–89.

Under de novo review, the State proved by a
preponderance that Burney's waiver was voluntary,
knowing, and intelligent, and thus the district court properly
denied the claim. No reasonable jurist could debate that
conclusion considering the record and the deference that
must be given to the state court's findings. We therefore
decline to issue a COA on the invalid *Miranda* waiver claim.

## V.

Burney also requests that we expand the COA to include
his claim that the trial court's admission of his codefendants'
allegedly "inadequately-redacted and self-serving
statements" violated *Bruton*. The district court's denial of
this claim is not debatable, so we decline to expand the COA
to include the claim. *See Miller-El*, 537 U.S. at 336.

In *Bruton*, the Supreme Court reversed a defendant's criminal conviction because the admission of a codefendant's confession violated the defendant's "right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." 391 U.S. at 126. George William Bruton and his codefendant (a man named Evans) were convicted of armed postal robbery. *Id.* at 124. During trial, a postal inspector testified that Evans had confessed that he and Bruton had committed the crime. *Id.* The trial court admitted the testimony but instructed the jury that Evans's confession "had to be disregarded in determining [Bruton]'s guilt or innocence." *Id.* at 125. But the Supreme Court held that the instruction was insufficient—because "Evans did not take the stand," Evans's confession (which implicated Bruton's involvement) was "not subject to cross-examination," so Bruton "was denied his constitutional right of confrontation." *Id.* at 127–28.

Here, both before trial and during trial, Burney unsuccessfully moved to sever his trial from the trials of Rembert and Burnett, based partly on the idea that a joint trial featuring the statements of Burney's codefendants would violate *Bruton* and related California state constitutional law. In response to this concern, the prosecution offered to "sanitize the statements of the various defendants." The redacted statements—which replaced the names of Burney, Rembert, and Burnett with pronouns and vague references such as "other" and "the others"—were the result. The trial court admitted the redacted statements into evidence, denied the requests for severance, and instructed the jury to consider each statement against its speaker only—not against any other defendant.

On direct appeal, the CSC determined that any *Bruton* error was harmless.   Although the State conceded—and the court assumed—that the statements were not sufficiently redacted to satisfy *Bruton*'s demands, the court concluded that any error "was harmless beyond a reasonable doubt." *See Harrington v. California*, 395 U.S. 250, 253–54 (1969) (applying the harmless-error doctrine to a *Bruton* claim). The court reasoned that "overwhelming evidence, apart from the   codefendants'   statements,"   supported   Burney's "convictions for the first degree murder, robbery, and kidnapping of Kondrath and the kidnapping-murder and robbery-murder special circumstances."

Burney presented his *Bruton* claim in his first state habeas petition, and the CSC summarily denied it on the merits.   He presented the claim in his second state habeas petition as well, and the CSC summarily denied it as procedurally barred.   Thus, AEDPA deference applies to this claim.   *See* 28 U.S.C. § 2254(d); *Catlin v. Broomfield*, 124 F.4th 702, 723 (9th Cir. 2024).

Here, Burney argues that the CSC's harmless-error determination was both "contrary to and an unreasonable application of" *Chapman v. California*, 386 U.S. 18 (1967), and "an unreasonable determination of the facts at trial." We analyze these arguments in turn.

A.

"[W]hen, as here, the state court has determined on direct appeal that an error was harmless beyond a reasonable doubt—the standard required for review of non-structural constitutional errors under *Chapman* . . . —a petitioner must demonstrate that the court 'applied *Chapman* in an objectively unreasonable manner.'"   *Sansing v. Ryan*, 41 F.4th 1039, 1050 (9th Cir. 2022) (quoting *Davis v. Ayala*,

576 U.S. 257, 269 (2015)). "That determination requires us to ask whether 'fairminded jurists' could agree with the [CSC's] conclusion" that any *Bruton* error "was harmless beyond a reasonable doubt." *Id.* at 1051 (citing *Ayala*, 576 U.S. at 269). "If so, relief is precluded under 28 U.S.C. § 2254(d)(1)." *Id.*

Burney argues that "Rembert's and Burnett's statements were not 'cumulative' of independently-admissible evidence." Specifically, Burney argues that Rembert's and Burnett's statements

> were the only sources of the following key evidence: that Burney forced the others to leave the apartment that night; that Rembert asked Burney not to shoot the victim; that Burney tried to make Burnett shoot the victim; and that Burney was the one who "just wanted to go ahead and [shoot]."

But no element of any offense of which Burney was convicted required that Burney forced the codefendants to leave the apartment, that a codefendant asked Burney not to shoot Kondrath, or that Burney tried to make a codefendant shoot Kondrath. *See* Reporter's Transcript on Appeal at 49–62, 65–94, *Burney v. Ayers*, No. 2:10-cv-00546-FLA (C.D. Cal. Jan. 31, 2018), Dkt. No. 104-35 (hereinafter "Jury Instructions") (defining the elements of each offense for the jury).[14] And although unlawful intent was an element of deliberate and premeditated murder, *see id.* at 65–66 (requiring that, for a non-felony-murder conviction, the defendant "manifested an intention unlawfully to kill a

---

[14] The cited page numbers are as assigned by CM/ECF.

human being" or committed "an intentional act . . . deliberately performed with knowledge of the danger to, and with conscious disregard for, human life"), other evidence overwhelmingly established that Burney had the requisite intent for deliberate and premeditated murder. Burney himself repeatedly admitted that he was aware of the apparent need to kill Kondrath to prevent future identification; that Burney stated, "we're gonna kill him"; that Burney fired the fatal shot; and that "nobody else did it."

Burney's statement also independently supported the elements of robbery and kidnapping. Burney admitted that he knew that his codefendants wanted to "rob" Kondrath of his car, so Burney approached Kondrath to ask for the time, which allowed the defendants to "snatch[] [Kondrath] out of his car." Burney admitted that he participated in forcing Kondrath into the trunk by urging him to "get in the trunk" while a gun was pointed at him. And then, Burney admitted, Burney drove Kondrath's car with Kondrath in the trunk to Howard's house before the shooting took place. These admissions supported Burney's convictions, even without Burney's codefendants' statements. *See* Jury Instructions at 78–80 (enumerating the elements of robbery), 81–82 (enumerating the elements of kidnapping), 82–85 (enumerating the elements of kidnapping to commit robbery).

Burney fails to identify any noncumulative, material evidence from the codefendants' statements. The CSC's harmless-error determination was reasonable. *See* 28 U.S.C. § 2254(d)(1); *see also Schneble v. Florida*, 405 U.S. 427, 431 (1972) (finding *Bruton* error harmless where the defendant confessed to the crime, and where the details of the defendant's own confession "were internally consistent,

were corroborated by other objective evidence, and were not contradicted by any other evidence in the case").

Next, Burney points to the fact that, during opening statement and closing argument, the prosecution repeatedly emphasized the statements of all three defendants.   But the trial transcript shows that the prosecution emphasized the statements of each defendant to show each defendant's involvement—not to use Rembert's and Burnett's statements as the sole evidence to prove any element of the charges against Burney.   Additionally, the trial court instructed the jury that "statements made by the attorneys during the trial are not evidence," and, as shown above, Burney's convictions had overwhelming evidentiary force even absent his codefendants' statements.   Jury Instructions at 31; *see also Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions." (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987))).

Burney also argues that the CSC unreasonably applied *Chapman* by failing "to examine the record as a whole" and by failing "to consider how the admission of the redacted statements actually hamstrung Burney's defense." Specifically, Burney contends that—had his own *unredacted* statement been admitted—he would have been able to argue more persuasively that Burnett was the ringleader who encouraged Burney to commit the crimes of which he was convicted.   Instead—because references to Burnett in Burney's statement were replaced with vague references like "one of the others"—Burney argues that the redaction of his statement prevented him from shifting blame to Burnett.

This argument contains at least two fatal flaws.   First, Burney's argument is irrelevant to the inquiry of whether any *Bruton* error was harmless.   To determine whether a

*Bruton* error was harmless, the relevant question is *not* whether separate trials might have yielded a different outcome but instead "whether [the codefendants'] admissions were sufficiently prejudicial to [the defendant] as to require reversal." *Schneble*, 405 U.S. at 432. After all, *Bruton*'s holding is rooted in the "right of cross-examination secured by the Confrontation Clause of the Sixth Amendment," not in any right to a trial separate from the trials of one's codefendants. 391 U.S. at 126. And, as discussed above, the CSC reasonably determined that the admission of the redacted statements of Burney's codefendants did not harm Burney. Second and relatedly, whether the trial court abused its discretion in denying Burney's motion to sever is not a constitutional issue for which we can grant habeas relief under AEDPA. *See Collins v. Runnels*, 603 F.3d 1127, 1131–33 (9th Cir. 2010) (recognizing that there is no clearly established law, binding on state courts, requiring severance). Thus, the CSC's alleged failure to consider the effect of the redactions on Burney's defense was not an unreasonable application of *Chapman*.

Finally, Burney contends that the CSC "unreasonably applied *Chapman*" by "evaluat[ing] the prosecution's case in the light most favorable to the prosecution." Specifically, Burney points to allegedly "implausible" aspects of Rembert's and Burnett's statements and argues that, had Burney been tried separately, he would have been able to impeach the statements. But again, the relevant question before the CSC was whether the *admission* of Rembert's and Burnett's statements was harmful error. *See Schneble*, 405 U.S. at 432. Had the statements not been admitted at all, there would have been nothing for Burney to impeach. Thus, the CSC's harmless-error determination

was not "contrary to, or involv[ing] an unreasonable application of" *Chapman*.   28 U.S.C. § 2254(d)(1).

B.

Under section 2254(d)(2), habeas relief might be warranted if the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Here, most of Burney's arguments about the CSC's factual determinations are recycled from his arguments about why the CSC unreasonably applied *Chapman*, and we reject those arguments again.   For instance, Burney argues that the CSC "ignored how heavily the prosecution relied on Burnett's and Rembert's statements to prove Burney guilty" and that Burney's statement failed to establish the requisite intent for robbery, kidnapping, and murder.   As explained above, Burney's arguments overstate the prosecution's reliance on Burnett's and Rembert's statements, and Burney's own statement established his criminal intent for the offenses of which he was convicted.   Even if these issues are recharacterized as issues of fact, the CSC's harmless-error determination was not unreasonable.

Next, Burney argues that the CSC "ignor[ed] . . . key facts of duress" in Burney's statement.   Burney argues that his statement showed that "his actions that night were made, not because he wanted to rob, kidnap, and/or kill the victim (who would not have recognized and identified him as a neighbor), but because he felt forced to by Burnett."   But

the jury was not instructed on a duress defense, and Burney identifies nowhere in the trial record where he raised duress anywhere to the jury or otherwise, so the relevance of any evidence of duress is unclear. *See generally* Jury Instructions. In fact, in California, duress is not a defense to murder, and duress alone cannot reduce a first-degree murder to a lesser offense. *See People v. Anderson*, 50 P.3d 368, 369, 379 (Cal. 2002). As explained above, Burney's own statement supplied evidence for each element of every crime of which he was convicted, and his codefendants' statements provided no unique support for those elements.

Finally, pointing to a jury note where the jury asked if it could "use the transcripts testimony of one of the defendants to support the lack of guilt for another defendant," Burney argues that his codefendants' statements "were . . . critical to [the] deliberations" and "were also being used collectively to evaluate the culpability of each accused." But Burney's argument is speculative—if anything, the jury note shows that the jury was particularly cautious about the inferences it drew from the statements and that it took care to follow the trial court's instruction not to consider Burney's codefendants' statements as evidence against Burney. *See* Jury instructions at 37–38. Either way, even assuming that the CSC ignored the note, that does not mean that its determination of the facts was unreasonable. *See Taylor*, 366 F.3d at 1001 ("To fatally undermine the state fact-finding process, and render the resulting finding unreasonable, the overlooked or ignored evidence must be highly probative and central to petitioner's claim.").

In sum, the CSC's harmless-error determination was not unreasonable, and this conclusion is not debatable. We

therefore decline to expand the COA to include Burney's *Bruton* claim.

***

For the reasons stated above, we decline to expand the COA and affirm the district court's denial of the habeas petition.

**AFFIRMED.**